Frazer and others *agt.* Western and others.

---

## FRAZER AND OTHERS, appellants, *agt.* WESTERN AND OTHERS, respondents.

### *Questions discussed.*

1. Whether there can be a *bona fide* purchaser from a person who is entitled to property by deed of gift, or a voluntary settlement; in case it afterward turns out that the grantor was indebted to such an extent that the conveyance or voluntary settlement would operate as a fraud upon his creditors?

2. Whether the mere fact that the purchaser from the holder of such a title has *notice* that it was not founded upon a *pecuniary consideration*, but was voluntary, is sufficient to make it his duty, at his peril, *to inquire* whether the title of his grantor was not fraudulent as against creditors?

3. Whether, under the evidence in this case, Western, one of the respondents, who purchased under a *voluntary trust deed*, was acquainted with the circumstances of the *grantor* at the time the trust deed was executed, so as to make it

his duty *to inquire* whether the deed of trust was not intended as a fraud upon the creditors of the grantor ?

4. Whether Western acquired the *legal title* to the premises in question, so as to entitle him to protection as a *bona fide* purchaser without notice ?

The bill of complaint in this cause was filed before the vice-chancellor of the first circuit by John Frazer, William H. Gibbs, and Charles Freeman, all of Charleston, in the state of South Carolina, complainants, against Henry M. Western, Mary Collins, Edward K. Collins, Sylvanus Miller, public administrator, and Ann Collins, Emma Collins, Israel Collins and Sextar Collins, infants, defendants, on the 30th day of April, 1833, showing that William Matthews, late of Charleston, South Carolina, on or about the 20th April, 1817, duly made and published his last will and testament, so as to pass both real and personal estate ; that said William Matthews departed this life some time in the year 1817, leaving his said will in full force, unaltered and unrevoked ; and Elizabeth Matthews, the executrix in the said will named, shortly thereafter caused the will to be duly proved according to the laws of South Carolina, and took upon herself the burden of executing the same, and that the other executors declined to act, and never did act as such executors.

That *Mary Collins,* in the said will, mentioned as one of the daughters of said William Matthews, was at the time of his decease the wife of *Israel G. Collins,* late of the city of New-York, deceased; that said Israel died in 1831, leaving said Mary Collins, his widow, and Ann, Emma, Israel, and Sextar, his infant children.

That all the devises and bequests in said will, for the benefit of the said Mary Collins, were made to the executors and executrix therein named, and to the survivors of them *in trust* to, and for the use of the said Mary *during her life, and, after her decease, to the use and behoof of her children,* to be equally divided between them.

That a part of the property so bequeathed for the benefit of the said Mary consisted of a large number of negro slaves, which were left by the said William Matthews at the time of

29

his death, which slaves were useless and unprofitable to the devisees in the said will named, the testator having devised to them no lands whereon the said negroes could be employed; that thereupon, some time in the year 1818, *John Frazer*, the husband of Ann Frazer, in said will, *named in conjunction with the said Ann, and Israel G. Collins, the husband of the said Mary, in conjunction with the said Mary*, caused a bill to be filed in the court of equity in Charleston aforesaid, in the names of the said John, Ann, Israel, and Mary, against said Elizabeth Matthews, and her two other children, John and Susan, being minors, by their guardian, stating that the said negroes had been divided among them, and those which had fallen to the shares of the said Mary, Ann, and Susan, were useless and unprofitable, as the testator had devised to them no lands whereon the said negroes could be employed, and that the parties were all desirous that the negroes should be sold, and the proceeds vested in public stock, or other productive funds, for their benefit; and in which the husbands of the said Ann and Mary, and the guardian of the said Susan, readily acquiesced, subject to the provisions and limitations of the said will; that they had applied to the said executrix to assent to such sale, but by her answer to the said bill, stated she had no power under the will to assent, and that the sale could only be made by order of the court.

That a hearing of that cause was had in said court of equity at Charleston, whereupon it was ordered and decreed by the said court that the sale of the said negroes should be made by the master of the said court; and further, that *the said John Frazer and Israel G. Collins should be substituted as trustees of the parts and proceeds of their said wives, arising from said sales*, on the giving to the said master ample security in double the amount of the property to be received by them, to secure the same to the uses and trusts, prescribed by the will of said William Matthews.

That in pursuance of such decree, a sale of the said negroes was made by the said master, and the proceeds thereof received by him, and the proportions due to the said Mary out of said

sale amounted to the sum of $7,596.25, or thereabouts, which sum was paid over by the master to said Israel G. Collins on account of said Mary and her children, pursuant to said decree, *on his giving the security hereinafter mentioned.*

That at the time of paying over said moneys, said Israel G. Collins, on the 26th February, 1818, together with said John Frazer, his security, by their bond or obligation became held and firmly bound unto William H. Gibbs, master of equity in the said court, and to his successor in office or assigns, in the penal sum of $15,192.50, with a condition that said Israel G. Collins or John Frazer, their or either of their heirs, executors or administrators, *do, and shall be answerable and liable in the said principal sum of $7,596.25, with interest from the date, to be accounted for by the said Israel G. Collins, as thereafter required, subject to the trusts in the said will, then the said obligation to be void.*

That to all those proceedings the said Mary Collins was a party and assenting to the same; and has duly hitherto, both before and since the death of her husband, the said Israel, received the interest on the said bond or obligation; that the principal sum of money in the said bond mentioned still remains secured by said bond and unpaid.

That the said *Israel G. Collins, in order further to secure to his wife, the said Mary, and her children, according to the terms of the said last will and testament, the said sum of money in the said bond or obligation mentioned; and in like manner to save his said surety, your orator, the said John Frazer, harmless from all loss and damage under the said bond or obligation above mentioned; and by way of collateral security for the same,* did, on the 7th August, 1828, by two certain deeds of bargain and sale, purporting to be made in consideration of one dollar, to him paid by Edward K. Collins, grant, bargain and sell, release, convey and confirm unto the said Edward, his executors, administrators, and assigns forever; all those certain lots of ground and premises described in said deeds as follows: (in the first deed giving a description of lot No. 55, situate in the ninth ward of the city of New-York, late the property of Isaac

Varian, deceased; and in the second deed describing all that south-westerly moiety or half-part of a lot situate on the east end of Staten Island, in the town of Castleton; in the county of Richmond, part of the farm of the late Abraham Van Duzer, deceased, containing four acres and a half of land, also all that south-westerly moiety or half-part of a certain water lot lying in front of the above.)

In trust, nevertheless, for the benefit and behoof of Mary Collins, wife of the said I. G. Collins, her heirs and assigns forever, and upon the further trust and confidence, they, the said Edward K. Collins, his executors, administrators or assigns, should and would release and convey all and singular the said thereby granted premises to such person or persons as she the said Mary Collins might, by her *last will and testament, or by her certificate in writing during her life time, and after the decease of the said Israel G. Collins, designate, and if no such last will and testament should be made, nor any such certificate be given,* then, that he the said Edward K. Collins should, after the decease of the said Mary Collins, release and convey the same to the heirs at law of said Mary Collins, and upon a further trust and confidence that he, the said Edward K. Collins, should and would at all times after the decease of the said Israel G. Collins, and until the said premises should be released or conveyed as aforesaid, *receive the rents and profits of the said premises, and pay over the same to the said Mary Collins, or her legal representatives.*

That said Israel G. Collins died some time in the year 1831, and that administration of all and singular the goods, chattels, rights, and credits which were of the said Israel, were, by the surrogate of the city and county of New-York, in due course of law, committed to Sylvanus Miller, public administrator, who took upon himself the burden thereof.

That the *said Israel, at the time of executing the two several deeds aforesaid, and at the time of his death was utterly insolvent, and has not left property* sufficient to pay his debts, including the property so covered by the two several deeds aforesaid.

That the said Mary Collins caused the property first above

described, as situated in the city of New-York, to be sold pursuant to the language of the trust deed; that the same sold for a large sum of money, which she duly received from the purchaser thereof, and that she is now proceeding by a bill of complaint against said Edward K. Collins, to compel a disposition and sale of the premises in the second deed above set forth, or some other execution of the trust in said deed, expressed, but for her individual benefit.

That said Mary Collins also insists upon payment of the said bond made by said Israel G. Collins and' said John Frazer as aforesaid to the said master in chancery, for her benefit; and refuses to credit what she has already received from the sale of the first-mentioned parcel of land on said bond, or to cause the same to be invested as the said will of said William Matthews requires, and in aid of said bond; and also insists that both of said trust deeds are for her individual benefit, and were not made as collateral security for the said bond, and thus seeks to take absolutely under said deeds, and exacts at the same time, and in addition thereto, the payment of the bond aforesaid.

That Henry M. Western claims some title or interest in the said premises in said trust deed mentioned, by virtue of some conveyance from the said Mary, which, however, your orators charge to be in trust for her.

That your orators consider the said several deeds *as merely voluntary, and therefore void as against the creditors of the said Israel G. Collins, unless they are to be treated and considered as collateral security for, or as made in aid and discharge of the said bond or obligation, so far as the proceeds or value thereof might go,* and have requested the said Mary Collins, and the said Edward K. Collins, to carry into effect the said trusts in the said last-mentioned deeds expressed, by a sale thereof, and to invest the proceeds of the property in both deeds mentioned in the manner required in and by said last will and testament of said William Matthews, and to credit the amount of such proceeds on the bond aforesaid, or to give up the said deeds to be cancelled as vountary deeds and void against creditors; and have requested said Henry M. Western to give up or cancel any deed or

writing he may have, so evidencing his title, or supposed title, as aforesaid, to the end that the proceeds thereof may, by due course of law, be disposed of by the said Sylvanus Miller in the course of administration, or by this court, to the end that the said bond or obligation being the first in degree among the debts due, and owing by the said Israel G. Collins, may be first paid out of the *proceeds*.

The bill then proceeds to charge that the several trust deeds were made by the said Israel at the time when he was insolvent and unable to pay his debts, and while the said bond was in full force against him, and therefore they are void, except in aid of the bond aforesaid; that said trust-deeds ought to be cancelled, to the end that the property may be sold and the proceeds disposed of in due course of administration, and the said bond as first in degree of debts duly paid, and the said John Frazer released therefrom. It also charges that said deeds can only be sustained as valid, if they were made, as charged, as collateral security to the said Mary Collins and her children, for the payment of said bond; and that said Mary is not entitled to the proceeds of said property in her own right, leaving said bond unpaid; and that the title of said Henry M. Western is fictitious, and created *without valuable consideration, and with a view to defeat your orators' rights herein.*

The separate answer of Henry M. Western, admitted, on information from the bill, all its principal statements, giving the proceedings in the case; and says he has no knowledge or information whether the said Collins died insolvent or not, but leaves the complainants to proof; but charges the truth to be, that the said Israel was not insolvent at the time of the date and execution of said last mentioned trust deed.

He admits that the said Mary Collins has filed a bill of complaint against said Edward K. Collins, to compel a disposition and sale of the premises in the said second deed mentioned, or some other execution of said trust, as in said bill is set forth; but saith that, at or before the sale of said last mentioned property to this defendant, said suit was abandoned by said Mary, and is at an end, her rights therein having entirely ceased.

He further admits that he claims, and actually has, a good and valid title to the premises in the second aforesaid trust deed described, and that said title exists by virtue of a certificate from said Mary Collins, made in pursuance of, and in compliance with, both the terms and spirit of the trust deed aforesaid, and he alleges that the same is a conveyance in good faith, and founded on a full and valuable consideration; and he denies that the same is in trust for the said Mary Collins, or that she is to receive the benefit accruing therefrom, either by an express or any implied understanding whatever; but he alleges and states the truth to be, that said conveyance is to his own use and for his own benefit and behoof.

Further, that on the 11th January, 1833, he obtained a judgment in the supreme court against said Mary for $326.37; that said judgment was an equitable, if not a legal lien on the title or interests of said Mary in said land; that he also had a claim against said Mary for services amounting to about $300; and that said Mary sought this defendant to become purchaser of said land, alleging she was the owner thereof, and producing said original trust deed as evidence of such ownership; that this defendant then had no knowledge or no notice of any other matters than those expressed in said deed, and entered into a negotiation with said Mary for the purchase of said lands; that a parol bargain was made, and afterward reduced to writing and signed and sealed by said Mary, the original of which is in possession of defendant, ready to be produced, and which was also duly recorded before the filing of the bill of complaint in this cause; that in pursuance of said contract, this defendant proceeded on the 8th April, 1833, to pay to said Mary, and did pay to her the sum of $1400 in cash, and at the same time executed and delivered to her a satisfaction of said judgment, and a discharge of said debt for $300, at the same time delivering to her certain valuable papers, on which this defendant had a lien for said debt; that he then received from said Mary a full and absolute certificate, and also a full and absolute conveyance of said property, which he caused regularly to be recorded, and under which he entered upon the premises and

still holds possession of the same, and which, as he insists, has vested in him the whole title, both legal and equitable to said property. And he charges the truth to be, and believes, that as well said Edward K. Collins as John Anthon, Esq., the complainants' attorney, knew of said negotiation and contract between this defendant and said Mary, in time amply sufficient to have filed their bill, or given notice to this defendant before the payment of said consideration money.

That to perfect his title, he has tendered said certificate to said trustee, and also a release of said lands. But that said trustee hath refused to execute the same, and this defendant respectfully submits, whether, as all the parties interested are before the court, an execution of said release, by said trustee, to this defendant, ought not, before crediting said consideration money on said bond, (if so decreed,) to be decreed to this defendant.

That he has heard and believes, and therefore alleges, that the said trust deeds mentioned in said bill were given in consideration of certain property received by said Israel G. Collins, for account of said Mary, from the estate of the brother of said Mary Collins, who died in South Carolina, without that, that they were voluntary deeds, without valuable consideration as in said bill, &c.

But this defendant denies that even if the trust deeds were voluntary, they would be void as against the creditors of the said Israel G. Collins, he being entirely solvent and uninvolved in, and unembarrassed with, debt at the time of the execution thereof; and he further alleges, that even if they were void, as in said bill is stated, he has a valid and equitable claim against the said separate estate of the said Mary Collins, secured by said bond as aforesaid, to the amount of the consideration paid for the conveyance of the premises as aforesaid.

The separate answer of Mary Collins denies that said Israel was in any manner induced to make the said conveyances (trust deeds) in order to save the said surety, the said John Frazer, from any loss or damage under the said bond, or by way of collateral security for the same; but on the contrary, this de-

fendant expressly charges that the said Israel, in the year 1822, possessed himself of $5,000, or thereabouts, which was the share that this defendant was entitled to of the estate of John M. Matthews, a brother of this defendant, who died in the year 1821 intestate; and this defendant further charges, that in case the said Israel G. Collins, in making the said conveyances in trust as aforesaid, was prompted by other than feelings of natural affection for this defendant and her children, that they must have been made for no other reason than that he might thereby secure some provision and permanent support for this defendant for that portion of her property which said Israel had received upon the distribution of her brother's estate.

Denies that said Israel G. Collins, either at the time of the execution of said two trust deeds, or at the time of his death, was utterly insolvent, but expressly charges, that at the time of the execution of the trust deeds he was connected in business with said Edward K. Collins as commission merchants, under the firm of I. G. Collins & Son. That they were then solvent, in flourishing circumstances, and so continued until the time of the death of said Israel; and that a considerable amount of property still remains in the hands of said Edward K. Collins, the surviving partner. That in addition to this property, he had at the time of the execution of the trust deeds, and also at the time of his death, large claims against the government of France, under the French convention, which claims came into the hands of the public administrator, by whom the same have been presented to the commissioners appointed under the treaty between the United States and France for adjudication and settlement.

Admits she sold the property in New-York, described in the first trust deed, and received about $1500 therefor.

Admits that Henry M. Western claims some title or interest in the premises in the second trust deed mentioned, by virtue of a certificate made and executed by this defendant, in pursuance of the powers and provisions contained in said second trust deed; but denies that the said Henry M. Western holds,

or pretends to hold, the same in trust for this defendant; but, on the contrary, saith that said certificate was executed by this defendant in ignorance of her rights, the said Henry M. Western having taken an undue advantage of the relation then subsisting between him and the defendant, (he the said Henry then being her sole legal adviser and counsel,) and thus induced this defendant to execute the said certificate without a full and valid consideration. That she has lately filed her bill of complaint to have said certificate given up and cancelled as void.

Denies that the trust deeds were merely voluntary, and therefore void, or against the conditions of the bond so executed by said Israel G. Collins and John Frazer, but on the contrary, charges that they were given for full and valuable considerations, and were never intended by said Israel G. Collins to be treated as collateral security for or in aid of said bond.

To each of these answers the complainants put in a general replication. The infant defendants, by their guardian, also put in a general answer.

Proofs were taken by J. C. HART, Esq., examiner, on the 17th January, 1837, and subsequently.

*Isaac Geery,* of the city of New-York, merchant, being sworn as a witness on the part of the complainants, testifies as follows: Did you know the firm of Israel G. Collins & Son, in the city of New-York, and who composed that firm? I did; and it was composed of Israel G. Collins and Edward K. Collins. Were you at any time the book-keeper of that firm, and between what dates? I was, from April, 1824, to the expiration of the firm in 1830; and I afterward continued the book-keeper of E. K. Collins until 1835. Was it not the usage of said firm to state an account with each partner at the end of each year, showing how his interest stood in the firm? It was. Look at the ledgers and other books now produced and shown to you. Are they the ledgers and books of said firm? They are; they consist of ledger A; journals A, B & C; cashbooks 1 and 2; day-books 1 and 2; letter-books 1 and 2, and bill-book. These books are marked by the examiner A, B, &c., to K. Look at the books for the year 1826, and state

how the balance stood at the end of that year, viz. :—on the first of January, 1827; was it or not in favor or against the said Israel G. Collins? It was against him $987.79. What was the character of the preceding year 1825–6, in relation to the said firm; was it prosperous or adverse? Adverse; very much so—so much so, that they talked of discharging me on account of their misfortunes. Look at the books for the year 1827, and state how the balance stood at the end of that year, namely, the fisrt of January, 1828; was it or not in favor of or against the said Israel G. Collins? It was against him $369.31. When was the said partnership dissolved? I think it was in May, 1830. Look at the books for each of the intermediate years, from the first of January, 1828, until the dissolution of said firm, and state how the balances stood each successive year with reference to the said Israel G. Collins, until such dissolution? On the first of January, 1829, the balance was against him $496.84; on the first of January, 1830, the balance was against him $927.65; on the first of May, 1830, the balance was against him $1,581.65. Did you then, or do you now know of any means which the said Israel possessed to pay said balances? No, sir. Who supported the said Israel and his family after such dissolution of the said firm? Edward K. Collins paid his board, and his clothing, &c., and other expenses, or bills that came in against his father. I cannot state positively that he was entirely supported by Edward K. Collins. How did you come to the knowledge of these facts? By paying his board-bills at the Asylum, and for articles of clothing. Did you hear any conversations on this subject between the said Israel and the said Edward K. Collins? I have heard Edward K. Collins tell his father to order clothes and he would pay for them; and that if he would leave his wife, he would support him and his family. When did Israel G. Collins die? I think it was in November, 1831. Of what disease did he die? He was drowned. What were his habits as to temperance; and how long before the dissolution of the firm did such habits manifest themselves? He was occasionally intemperate from the time I first went with him,

and it increased until the time of the dissolution, and so continued until his death. Was the said Israel at any time, from such habits, in the Lunatic Asylum; and who paid his expenses there? He was; and his expenses were paid by Edward K. Collins.

*Sylvanus Miller* was the next witness sworn for the complainants. His testimony, in substance, was, that in the year 1830, administration of the estate and effects of Israel G. Collins was committed to him; that he never had any property of any kind under his possession or control, nor did he know of any belonging to the estate of said I. G. Collins. Never received any assets belonging to the estate.

*William H. Munn,* the next witness sworn for complainants, proved that in 1826 and 1827 Israel G. Collins occupied a house in the city of New-York, belonging to the father of witness, who had to prosecute Collins for a quarter's rent due May, 1827, and obtained judgment; but had never been able to find any property of Collins to collect it.

The complainant here rested; and the defendant, H. M. Western, offered testimony.

*Alexander Kursheedt,* a witness produced and sworn on the part of the defendant, H. M. Western, testifies as follows:

I reside in the city of New-York, and am an attorney at law. Were you in Mr. Western's office at the time the lands in question were purchased by Mr. Western of Mrs. Collins? I was. In what year was that? In the year 1832 or 1833. What was the consideration of that sale by her? $1,400 in cash, a satisfaction of a judgment in the supreme court, and some receipt or discharge of a bill for advice as counsel. Was there not, in addition to that, a delivery of some papers to her? There was. In this sale, at what was the whole value of that property estimated? It was considered by her, according to my recollection, as equivalent to $2,100. Had not Mr. Western, at the time of this sale, and for some time previous, ceased to be her counsel? I did not know that she bore the relation of a client to him at that time; and I, at that time, was a partner in part of his business. Did you soon, and how soon

after, attempt to make a sale of this very property on Mr. Western's account,—to wit, the property purchased by him of Mrs. Collins? It was prior to the 13th day of May, 1833, Mr. Western contemplating the purchase, that I endeavored to make a sale of the property in question to a person by the name of Patten, residing adjoining the property. He offered for it $2,500. It was difficult to raise at that time $1,400 in cash, which was necessary to effect the purchase of Mrs. Collins. I think Mr. Patten could not raise the money; at all events, the negotiation with him fell through. Patten offered but $2,500 in promissory notes, at different dates, to be secured by mortgage, as I think : pending this negotiation with Patten, Mr. Western raised the money by mortgage on other property, and concluded the purchase. Had Mr. Patten been willing to have raised $1,400 in cash, and to have secured the rest within a short period, Mr. Western would have sold it to him. I considered it a good purchase for Mr. Western; and I thought it a good sale for her, inasmuch as she received $1,400 in money, which she seemed to be sadly in want of, and was very anxious to get. I saw the money paid, to wit, $1,400, by Mr. Western to her.

*William C. Boardman,* a witness produced and sworn on the part of the defendant, H. M. Western, testifies as follows :

Have you seen Mrs. Mary Collins, one of the defendants, lately? I called with Mr. Western on Mrs. Collins on the 14th of June instant. What was the cause of your calling on her? Mr. Western having received a letter from her of the following tenor :—it urged Mr. Western to call on her, in relation to the lands in controversy in this suit. Upon calling, what took place? Mrs. Collins said that she had sent for Mr. Western, as she wished that justice should be done in regard to the land he had purchased of her, and that he should be relieved from the suits pending in chancery in regard to it, or words to that effect: she said in the course of the conversation, that Mr. Western had fairly and honorably bought the land of her, at her repeated request, and when no other person would take the title she could give. She also said that she had

thought much upon the subject during her illness, and that she had determined that justice should be done him, as far as in her power to effect it.   She also remarked that she would do any thing that she could to effect that object.   She stated in regard to the suits in chancery, that they were brought without her knowledge or consent, and she was not aware of them until after they were brought, and only learned it accidentally. She said that she believed they were brought by Edward K. Collins for his own benefit, and with the view of getting the land unjustly for his own benefit.   She also said that if Frazer knew of the suit at all, she believed that he had only allowed his name to be used by Mr. Collins for his, Collins's, own benefit, and gave as a reason for that, that Mr. Frazer's liability on a certain bond was settled by the decision of a court in South Carolina, where she had sued Frazer on this bond, and the suit was decided in his favor; and that information could be had upon the subject by application to Mr. Pettigrew, Mr. Frazer's attorney, by any disinterested person.   Did she or not disclaim Mr. Western's being her counsel at the time of the purchase, and also that he had used any undue influence over her?   She spoke of having left Mr. Western, and of employing other counsel; and she said no undue influence had been used; on the contrary, that she considered it a very friendly or kind act of Mr. Western in having taken the land of her at the time.   What was her condition as to health when you called?   She said she was better than she had been; but she appeared to me to be in extreme ill health; and I remarked after leaving her, that I thought she could not live but a short time.   She appeared, however, to comprehend perfectly well all that was said to her, and all matters relating to business that were mentioned.

*Isaac P. Martin,* a witness produced and sworn on the part of the defendant, H. M. Western, testifies as follows:

Was you a clerk with Mr. Western at the time of the purchase by him of the land in dispute of Mrs. Collins?   I was. What time was it?   In May, 1833.   How old were you then? About seventeen years old.   Was you privy to the purchase of

this land on Staten Island, that she sold to Mr. Western?
I knew that she was anxious to sell the land, and that he after-
ward purchased it. Which party sought the other? She
came to Mr. Western's office frequently. Were they then, and
had they not previously been on bad terms? Yes, I believe
they were. Mr. Western had brought a suit against her for
his costs. Do you remember whether or not Mr. Western was
unwilling to have any negotiation with her in relation to the
land, and declined it in the first instance? I don't recollect·
that such was the fact, although I have no doubt that it was so.
It is my impression it was so. Was you present when Mr.
Western paid her the money? I was. Was she attended by
any body as her adviser when she received that money? I
think she was. I do not recollect his name. The witness
adds these words:—From what I saw of the transaction she
appeared to be desirous of selling, and the matter appeared to
be done in the ordinary course of business, without any com-
pulsion on the part of Mr. Western, and from information that
I got at the time the full value of the property was given to her
by Mr. Western.

*Cornelius V. S. Kane* was the next, and last witness sworn
for defendant, Western. He testified that he was an attorney
at law, and resided in the city of New-York; that in October,
1832, he was retained by Mrs. Collins to defend a suit brought
against her by Henry M. Western as plaintiff, for fees as attorney.
After putting in a plea of the general issue, and filing an affi-
davit of merits, was not instructed to make any further defence.

The deed of trust from Israel G. Collins to Edward K. Col-
lins, bearing date August 7, 1828, of the Staten Island pro-
perty, and the deed from Mrs. Mary Collins to Henry M.
Western, of the same premises, bearing date May 13, 1833,
were then offered and read in evidence.

The evidence on both sides here closed.

On the 18th November, 1841, MURRAY HOFFMAN, Esq.,
assistant vice-chancellor of the first circuit, after giving an
elaborate and able opinion, (1 *Barb. Ch. R.* 220,) made the fol-
lowing decree :—

" It is hereby declared, ordered, adjudged and decreed, that the conveyance in the pleadings mentioned from Israel G. Collins to Edward K. Collins, dated the seventh day of August, in the year one thousand eight hundred and twenty-eight, of the premises at Staten Island, particularly described in the pleadings, is void as to the complainants and all others, the creditors of Israel G. Collins deceased, whose debts shall be proved before and allowed by the master on the reference hereinafter directed ; and it is further ordered, adjudged and decreed, that it be referred to William W. Campbell, Esq., one of the masters of this court, residing in the city of New-York, to call in the creditors of Israel G. Collins, deceased, to prove their claims, and that the said master state the nature and priority of the debts so proven before him according to the provisions of part 2, title 3, chapter 6, art. 2, of the revised statutes, with all convenient speed, and that for the purposes of this reference, the bill of complaint in this cause be answered by making the same applicable on behalf of the complainants and all the creditors of Israel G. Collins, who may come in and contribute to the expenses of this suit, according to the practice of this court.

" And it is further ordered, adjudged and decreed, that the premises in the said deed mentioned be sold under the direction of one of the masters of this court, and a proper deed be executed by the master to the purchaser thereof ; and the proceeds be brought into this court, to be distributed according to said report among the creditors of the said Israel G. Collins, upon the further order of the court in the premises.

" And it is further ordered, adjudged and decreed, that upon payment out of the said proceeds of all the debts due and owing by said Israel G. Collins, that H. M. Western be subrogated to the rights of said I. G. Collins and his heirs, so far as to authorize him to file a bill in this court to vacate the sale made by said Mary of the premises in the first deed mentioned.

" It is also further ordered, adjudged and decreed, that the costs of the infants, and of the public administrator, be paid out of said proceeds, before distribution, to the date of this decree, but that no further costs be allowed therein, their in-

terference in the court being unnecessary. All other questions as to costs and distribution to be reserved until the coming in of the master's report."

Western appealed from this decree to the chancellor, who, on the 8th December, 1845, reversed the decree of the assistant vice-chancellor, (*see his opinion,* 1 *Barb. Ch. R.* 235,) in the following form :

" It is declared, and the chancellor doth declare, that the conveyance of the premises on Staten Island, from Israel G. Collins to Edward K. Collins, dated the seventh day of August, one thousand eigth hundred and twenty-eight, mentioned in the said pleadings, is not against the said Henry M. Western fraudulent and void in respect to any of the creditors of the said Israel G. Collins; and that the conveyance of the said property from Mary Collins to the said Henry M. Western is valid. And, therefore, it is ordered, adjudged and decreed, and the chancellor, by virtue of the power and authority in him vested, doth order, adjudge and decree, that the said decree of the assistant vice-chancellor of the first circuit be, and the same hereby is accordingly in all things reversed ; and it is further ordered, adjudged and decreed, that the bill of the said complainants be, and the same hereby is accordingly dismissed from, and out of this court. And it is further ordered, adjudged and decreed, that the said complainants pay to the said defendant, Henry M. Western, his costs of this suit, and also the costs of the said appeal to be taxed; and that the said Henry M. Western have execution for his said costs against the said complainants.

" And it is further ordered, that the proper order be made in this cause, directing the complainants to pay to the guardian, *ad litem,* of the infant defendants, their costs to be taxed, and disposing of all questions of costs as between the complainants and the defendants, other than the said Henry M. Western and the infant defendants. And that the proceedings be remitted to the vice-chancellor of the first circuit, to the end that this decree may be carried into full execution.

The complainants appealed from the decision of the chan-

cellor to the court for the correction of errors. Western, and also the infant defendants, by their guardian, put in their answers to the petition of appeal. The cause, by operation of law, was transferred to the court of appeals, where it was argued in November term, 1847, in the city of New-York.

John *Anthon*, *Attorney*.
Seth P. *Staples*, and
George *Wood*, *Counsel* for appellants.

*First.* In this case it appears that in the year 1818 Israel G. Collins became the trustee of a sum of money, amounting to between seven and eight thousand dollars, the proceeds of property given by William Matthews to his daughter Mary, then the wife of said Collins, for her use, during her life, and after her decease to go to her children.

*Second.* To secure this money, Collins gave his bond to one of the officers of the court of chancery of South Carolina, to secure the payment of the interest to his wife Mary Collins, and the principal to her children after her decease; and said John Frazer, one of the appellants, became the surety on said bond.

*Third.* In the course of the next ten years after the receipt of the said money, said Collins spent the same and all his estate, and became wholly insolvent.

*Fourth.* While thus insolvent, said Israel G. Collins made the conveyances set forth in said bill of complaint, and alleged to be fraudulent and void, as against creditors.

*Fifth.* Henry M. Western, one of the respondents in said bill, purchased of Mrs. Mary Collins, after the death of her husband, one of said pieces of land, being the property in question, and now holds the same, and insists that he has acquired a good title thereto. The complainants insist that he made said purchase under such circumstances that acquired no title thereto, as against the complainants. Because they say :—

1. That the proof shows that at the time said Israel G. Collins made said conveyance of the premises in question to his son, E. K. Collins, in trust for his wife, he was wholly insol-

Frazer and others *agt.* Western and others.

vent.   See the deposition of Isaac Geery, page 41 of the case ; Sylvanus Miller, Esq., page 42 of the case ; and William H. Munn, Esq., page 43 of the case.

2. If said Israel G. Collins was insolvent at the time he gave the deed and made the conveyance in question, the same is void as against creditors.

To this point it is unnecessary to cite authorities.

3. Henry M. Western obtained no better title from Mary Collins than she obtained by her deed from her husband, as that deed was put into his hands before his purchase; and as other circumstances appear, both from his answer and other proof, sufficient to put him on inquiry as to the validity of her title.   (1 *Merivale,* 282; *Smith* v. *Low,* 1 *Atkins,* 490 ; *Taylor* v. *Baker,* 5 *Price,* 306, 311; *Chesterman* v. *Gardner,* 5 *John. Chy.* 33; *Taylor* v. *Stibbart,* 2 *Vesey, Jr.* 440; *Daniels* v. *Davison,* 16 *Vesey,* 249; *S. C.* 17 *Vesey,* 432, 433 ; 1 *Hovenden's Notes on Vesey, Jr.* 288, 214; *his 2nd Note on Taylor* v. *Stibbart; Whitehead* v. *Jordan,* 1 *Young & Coly.* 328 ; 3 *Sug. Vendors,* 332, *pl.* 51, *cites this case ; Crofton* v. *Ormsby,* 2 *Sch. & Lef.* 599 ; *Powell* v. *Dillon,* 2 *Ball and Beat.* 521.)

Possession of the estate sufficient to put one on inquiry. Previous notice as to claims sufficient to put on inquiry as to what they are.   Possession *by tenant is notice.*   Possession by tenant is sufficient notice that there was a lease.   Possession by tenant is notice of a lease.   Possession by tenant is notice of his interest.   Purchaser has notice of all under tenants' interests.   Tenant in possession full notice, (2 *Ball & Beat.* 521,) a strong case.   Examine chancellor's opinion.   The deed to E. K. Collins was placed in Western's hands, and it was quite sufficient to put him on inquiry.

4. The complainants come properly before the court, and are entitled to relief.

*G. Wood* in reply.   Bill double aspect.   1. Conveyance on account of wife's money received; if not, 2. Then voluntary and fraudulent against creditors.—First ground defendants repudiate, and so we are obliged to go on the second.— Then two questions.   1. Is it fraudulent and void as against

creditors? 2. Was there enough to put Western upon inquiry? I maintain affirmative of both.

Western got only an *equitable*—not legal estate—and we as creditors had the *prior* equity. (*Atherly Mar. Settlt.* 212, enough to put on inquiry, 2 *Vern.* 384; 1 *Hare*, 56; 12 *Ves.* 113; *Amb.* 313; 2 *Sch. & Lef.* 599; 1 *Meriv.* 282; 16 *Ves.* 249; 1 *Atk.* 490; 6 *Bing.* 118; 13 *Ves.* 113; 2 *Paige*, 205.)

This is not an executed trust—is an active trust.

H. M. *Western*, respondent in person, *and*
Wm. Beach *Lawrence, and*
Charles O'*Conor, Counsel* for respondent.

*First.* By the conveyance from Israel G. Collins to E. K. Collins, of 7th August, 1828, in trust for the use, benefit and behoof of Mary Collins, her heirs and assigns forever, Mrs. Collins acquired by the operation of the revised statutes, if not before, an absolute legal estate in fee in the premises. (*See* deed, case, 52, 53, 1 R. S. 727, § 47. *In the matter of Decay,* 4 *Paige*, 404. *Chancellor's opinion, case,* 77, 78, 79.)

*Second.* The answer of the respondent Western, (which is not only responsive to the bill, but the truth of which is expressly admitted by the complainant's stipulation,) as well as the proofs taken in the cause, shows that he was a purchaser from Mrs. Collins in 1833, and after the death of her husband, for a valuable consideration, and which was actually paid without notice of any matter to induce him to question the validity of Mrs. Collins's title. (*Case, pp.* 24, 25, 36, 44, 47, 48.)

*Third.* There was nothing on the face of the deed of trust as in the cases cited by the assistant vice-chancellor (*case,* 67, 68) to induce suspicion; nor would the fact of the consideration mentioned therein being nominal, been constructive notice to Western that the grantor in the said deed was insolvent, or that it was made to defraud creditors, if such had been the case. (*Sigourney* v. *Munn,* 7 *Conn.* 333; *Kennedy* v. *Green,* 3 *Myl. and K.* 699; *Taylor* v. *Baker, Daniels,* 71; *Booth* v. *Barnum,* 9 *Conn.* 289; *Hawley* v. *Cramer,* 4 *Cow.* 717; *Green* v. *Slayter,*

4 *J. C. R.* 47; *Pendleton* v. *Fay*, 2 *Paige*, 204; 2 *R. S.* 137, § 4; *Chancellor's opinion, case, p.* 76.)

*Fourth.* The decree of the A. V. C. in allowing the subrogation of Western to the rights of I. G. Collins and his heirs, so far as to authorize him to file a bill to vacate the sale of the premises in New-York, is inconsistent with the idea of actual fraud in Western. (*Case, p.* 55; *Sands* v. *Hildreth*, 14 *J. R.* 498.)

*Fifth.* If the trust deed was fraudulent, Western, as a purchaser from Mrs. Collins, for valuable consideration, without notice, would be entitled to protection even against the claims of creditors intended to be defrauded thereby. (*Roberts* v. *Anderson*, 18 *J. R.* 525, *reversing S. C.*, 3 *J. C. R.* 375; 2 *R. S.* 137, § 5; 1 *R. L.* 77, § 6; *Rev. Notes*, 3 *R. S.* 658, 2nd ed. ; *Chancellor's opinion, case, p.* 79; 1 *Story Eq. J.* 646; *Bean* v. *Smith*, 2 *Mass.* 282.)

*Sixth.* The conveyance made by the trust deed was not voluntary, but for a valuable consideration growing out of certain property received by Israel G. Collins, on account of Mary Collins, from the estate of her brother, who died in South Carolina, and out of which a court of equity would have made a provision for the wife; and the answer of Western, as well as that of Mrs. Collins, through whom the decree against Western must be made, both of which are responsive to the bill, denies that it was voluntary. (*Mumford* v. *Murray*, 1 *Paige*, 620; *Smith* v. *Kane*, 2 *Paige*, 303; *Van Epps* v. *Van Deusen*, 4 *Paige*, 64; *Glen* v. *Fisher*, 6 *J. C. R.* 36; *Howard* v. *Moffat*, 2 *J. C. R.* 206; *case, pp.* 26, 30, 31; *Chancellor's opinion, case,* 76.)

*Seventh.* If voluntary, it is not therefore void, but in all cases arising under the statute of fraudulent conveyances, the question of fraudulent intent is a question of fact to be determined from the circumstances attending the transaction, and though the consideration be nominal or founded on natural love and affection, mere indebtedness is not a ground for avoiding a conveyance, even according to the cases cited by the assistant vice chancellor were they applicable, which they are not. (*Seward* v. *Jackson*, 8 *Cow.* 407; *Van Wyck* v. *Seward*, 1 *Ed.* 327; *S. C.* 6 *Paige*, 62; *S. C.* 18 *Wend.* 406; *Jackson* v. *Peck*, 4 *Wend.*

300; *Jackson* v. *Timmerman*, 7 *Wend.* 436; 2 *R. S.* 137, § 4; *Rev. Notes*, 3 *R. S.* 658, 2nd ed. ; *Hinde's lessee* v. *Longworth*, 11 *Wheat.* 199; *Townsend v. Westacott*, 2 *Beavan*, 340; *Shears* v. *Rogers*, 3 *Barn. & Ald.* 362; *Bonney* v. *Griffith*, *Hays*, 115; *Lush* v. *Wilkinson*, 5 *Ves.* 384; *Kidney* v. *Coussmaker*, 12 *Ves.* 152; *Halloway* v. *Millard*, 1 *Mad.* 414.)

*Eighth.* It is the state of the grantor's circumstances at the time of making the conveyance, not at a subsequent period, or at the time of his death, which is to affect the validity of a conveyance. (*Seward* v. *Jackson*, 8 *Cow.* 407; *Van Wyck*, v. *Seward*, 6 *Paige*, 67, aff'd 18 *Wend.* 375.)

*Ninth.* There is no evidence that Israel G. Collins was insolvent at the time he made the trust deed ; but it is denied by the answers responsive to the bill of Western and Mrs. Collins. (*Case, pp.* 12, 16, 23, 26, 31.)

*Tenth.* The bond executed in South Carolina was not payable at the time of the execution of the trust deed, and even if it should be deemed technically a debt within the contemplation of the statute of fraudulent conveyances, all inference of fraud is rebutted by the fact that the parties beneficially interested in the bond and trust deed were the same individuals, viz., the wife and children of Collins.

*Eleventh.* Whatever the claim of creditors might be, the complainants show no right to file this bill against any of the parties to the suit, much less against the respondent Western.

1. There is no allegation of any breach of condition, or the occurrence of any event by which the bond was forfeited. The interest or income had been regularly paid to Mrs. Collins, who was still living.    (*Case, pp.* 6, 8, 9; *Bill, fol.* 2, 9, 12, 13.)

2. Frazer, the surety, was not entitled to bring a suit even against Collins or his repsesentatives, till he had paid the debt, or been actually damnified, much less could he do so till the debt was legally due.    Nor do any of the cases cited by the assistant vice chancellor authorize such proceedings in a case like the one before this court. (*Ranelogh* v. *Hayes*, 1 *Vern.* 189; *Cook* v. *Ravie*, 6 *Ves.* 283; *Lee* v. *Rook*, *Moseley*, 318;

*Campbell* v. *Macomb*, 4 *J. C. R.* 534; *Code Civil, art.* 2032; *Aberdeen* v. *Blackman*, 6 *Hill*, 324; *Birge Suretyship*, 374.)

3. There was no judgment obtained by the complainants against Collins, in his life time; and, according to the English law, conveyances of land cannot be set aside for fraud, except by creditors, who have reduced their debts to judgments, before the death of the parties making them. In the United States the rights of creditors as to such conveyances are derived from local statute, and there is no statutory provision for such cases in this state. (1 *Story Eq. Jur.*, §§ 375, 376; *Parslow* v. *Weadon*, 1 *Eq. Ab. p.* 7; 1 *Fonb. Eq. B.* 1, *C.* 4, §§ 12, 14; *Drinkwater* v. *Drinkwater*, 4 *Mass.* '354; *Wildbridge* v. *Patterson*, 15 *Mass.* 148; *Mass. R. S.* 454, § 11.)

*Twelfth.* There was nothing in the relations of counsel and client, had they existed, that would have prevented the respondent Western from making the purchase in question, on the terms on which it is proved to have been made, from Mrs. Collins. The relations of counsel and client between Western and Mrs. Collins had, however, ceased long before the purchase; but had the purchase been voidable on account of the supposed relations, the objection could only have been taken advantage of by Mrs. Collins, or by a party claiming under her, and could not avail the complainants; nor is this matter made a ground for relief in the bill. (*Case*, 45, 46, 47, 48; *Kenny* v. *Brown*, 3 *Ridg. P. C.* 462.)

☞ No question made on the twelfth point on the other side. ☜

*Thirteenth.* It was not competent for the assistant vice chancellor to allow the complainants to amend their bill, the primary object of which was to declare the trust deeds collateral security for the payment of the South Carolina bond, at the hearing of the cause, and to proceed to a decree, as on a creditors' bill on behalf of the complainants and others, without giving to the defendant Western an opportunity to answer the new and totally different case made by such amendment. (*Chancellor's opinion, case,* 74; *Mitford's Pl. by Jeremy,* 331, *n. a; Story's Eq. Pl.*, §§ 886, 891, 904; 3 *Dan. Chy., p.* 1654; *Goodwin* v. *Goodwin*, 3 *Atk.* 370.)

Frazer and others *agt.* Western and others.

*Fourteenth.* Nor could the bill have been, at any stage of the proceedings, amended in the manner directed by the assistant vice chancellor; nor could such a bill, if amended, have been sustained.

1. When a bill is filed by one or more creditors on behalf of himself or themselves, and of all others who may come in and contribute to the expenses of the suit, the nature of the proceeding should appear on its face. (*Brown* v. *Ricketts*, 3 *J. C. R.* 556 ; *Leigh* v. *Thomas*, 2 *Ves.* 313.)

2. Since the revised statutes, it is no longer allowable for a creditor to file a bill against the personal representatives and heirs or devisees of a deceased debtor jointly for the purpose of compelling payment of the debt, nor is the decree as formerly for a sale of the real estate and the distribution of the proceeds thereof among all the creditors, who may come in under the decree, but each creditor must file a bill for what the heirs or devisees are liable to pay him. (*Betts* v. *Genung*, 5 *Paige*, 256; *Leonard* v. *Morris*, 9 *Paige*, 93.)

*Fifteenth.* The complainants do not aver in their bill that the deeds of Israel G. Collins were made " with intent to defraud, hinder, or delay creditors;" nor are the facts averred conclusive evidence of such intent. (*Cunningham* v. *Freeborn*, 11 *Wend.* 240.)

☞ *Charles O'Conor*, same side. (11 *W.* 224, 240; 4 *Hill*, 652; 8 *C.* 422; 2 *Hov. Fr.* 76; 1 *Hare Ch. R.* 43—V. C. WIGRAM; 2 *Vern.* 599; *Cornish Uses*, 58.)

The following opinion was delivered for affirmance :—

JEWETT, Ch. J.   I am of opinion that the decree of the chancellor should be affirmed.   Western shows that he is a *bona fide* purchaser for a valuable consideration, without actual notice of the insolvency of I. G. Collins at the time he conveyed the premises to E. K. Collins in 1828 in trust for his wife and children, and to be conveyed by him according to her appointment.   There is no ground to subject Western to the consequences of a constructive notice of the insolvency of I. G. Collins in August, 1828, although he saw the trust deed, and could see that it was voluntary, made upon a nominal con-

sideration—that fact alone would not necessarily or naturally lead him to the inquiry or ascertainment of the fact of the insolvency of Collins at the time of executing the deed.

There is no evidence that Western had any acquaintance with the person of I. G. Collins, or of his pecuniary circumstances, or that their situation was such as would probably lead Western to ascertain them.

The following opinion was delivered for reversal.

BRONSON, J. This case has been fully considered in the court of chancery; (1 *Barb. R.* 220;) and as the chancellor and assistant vice-chancellor have only differed upon a single point, I shall do little more in relation to the other questions in the cause than to state the conclusions at which I have arrived.

1. This is a bill with a double aspect; but as one of the grounds on which the complainants proceeded was denied by the answers, and has not been supported by proof, it is only necessary to consider the case in the remaining aspect of a bill to set aside a conveyance as being a fraud upon creditors.

2. The complainant Gibbs, the master in equity, to whom the bond of Collins was executed in 1818, or Freeman, the successor in office of the obligee, who is also party complainant, must be regarded a creditor of Collins to the amount secured by the bond. It is unnecessary, therefore, to inquire whether the bill could be maintained by the other complainant, Frazer, who was the surety for Collins.

3. I have been unable to read the evidence without coming to the conclusion that Collins was insolvent at the time he executed the trust deeds to his son in 1828, and that he continued to be insolvent until the time of his death in 1831. There was no attempt to answer the proofs of the complainants upon that point.

4. The trust deeds were not made in pursuance of an antenuptial agreement, nor upon any valuable consideration; but were voluntary conveyances, made for the benefit of the grantor and his family, and were clearly fraudulent and void as against those who were then creditors of the grantor.

5. As Collins was dead, it is quite obvious that the creditors who filed this bill could not reach the property in the usual way of a judgment and execution against the fraudulent grantor; and they were consequently at liberty to go into chancery for the purpose of setting aside the fraudulent conveyance, and having their debt paid out of the property.

6. The bill should have been filed on behalf of the complainants *and all the other creditors* of Collins who might come in and prove their debts and contribute to the expenses of the suit. But this is an objection of mere form, and not of substance, which might be cured by amendment; and as the amendment would not make a new case, or one to which there could be any different answer on the part of the defendants, I see no reason why it might not be allowed at the hearing.

7. If the legal estate under the trust deeds still continued in the trustee, it follows that Mrs. Collins, the *cestui que trust*, only conveyed an equitable interest in the Staten Island property to Western; and then, as the complainants have the prior, and consequently the better equity, their claim must prevail. Western cannot protect himself on the ground of *bona fide* purchase for a valuable consideration without notice.

But as it is not material in the view which I entertain of the case to examine that question, I shall assume that by virtue of our statute of uses and trusts the equitable interest which Mrs. Collins had at the first in the property, was turned into a legal estate on the death of her husband in 1831; and, consequently, that Western, who purchased from her in 1833, is in a condition to set up the defence on which he relies; and if, in truth, he is a *bona fide* purchaser without notice, in the legal sense of those terms, the defence must prevail.

8. That Western paid a valuable consideration for the land is admitted; and there is no proof that he had actual notice of any defect in the title of his grantor. This brings us to the principal question in the cause, which is, whether Western had constructive notice that the trust deed through which he claims title was fraudulent and void as against the creditors of Collins.

On this point I am unable to agree with the chancellor. It

should ever be borne in mind that the plea or defence of a *bona fide* purchase without notice is only resorted to where the vendee is under the necessity of claiming a better right than his grantor had to convey; and where, if the defence succeeds, some innocent person must suffer damage. For this reason the defence, though a very good one in a proper case, should always be received with great caution. It is not enough that the purchaser may be wholly free from the charge of actual fraud, although he may not have had express notice of any latent equity or defect of title, still if any matter came to his knowledge pending the negotiation which was calculated to awaken attention, and put an honest man of ordinary caution upon inquiry, the law charges him with notice of every fact which the inquiry would probably have elicited. It is the settled doctrine of courts of equity, that whatever is sufficient to put a party upon inquiry, is constructive notice to such party, and will as effectually deprive him of the character and standing of a *bona fide* purchaser as though he had express notice. And especially is he bound to inquire when the facts are such as to point him to the proper source for obtaining information. Whenever such a case arises before the sale is consummated, the purchaser is bound by a just regard for the rights of others to stop and seek information; and if he neglect to do so, it is, and should be at the peril of being charged with the knowledge of those facts which, in the exercise of reasonable and proper diligence, he might have ascertained.

The doctrine of implied notice was laid down by baron ALDERSON, in *Whitbread* v. *Jordan,* (1 *Younge & Collyer,* 303, 328,) in these terms :—" I apprehend that when a party, having knowledge of such facts as would lead an honest man, using ordinary caution, to make further inquiries, does not make, but, on the contrary, studiously avoids making such obvious inquiries, he must be taken to have notice of those facts which, if he had used such ordinary diligence, he would readily have ascertained." And in *Kennedy* v. *Green* (1 *Mylne & Keene,* 609) the rule was thus stated by lord BROUGHAM :—" Whatever is notice enough to excite attention, and put the party on his

guard, and call for inquiry, is also notice of every thing to which it is afterward found that such inquiry might have led, although all was unknown for want of the investigation." It is upon this principle that when one purchases an estate which is in the occupation of a tenant of the vendor, he is deemed to have notice not only of the lease and its contents, if there be one, but of all the interest which the tenant may have in the property, though it be of a character which does not at all belong to the relation of landlord and tenant. Knowing that there is a tenant in possession of the land, it is the duty of the purchaser to seek him and make inquiry; and if he neglect to do so, it will be at the hazard of being held cognizant of all the facts which the inquiry would have revealed. (*Taylor* v. *Stibbert*, 2 *Ves.* 437; *Daniels* v. *Davison*, 16 *Ves.* 249; 17 *id.* 433, S. C.; *Crofton* v. *Ormsby*, 2 *Scho. & Lef.* 583, 599; *Powell* v. *Dillon*, 2 *Ball & Beatty*, 416; *Chesterman* v. *Gardner*, 5 *John. Ch.* 29; *Meax* v. *Maltby*, 2 *Swanst.* 281; *Allen* v. *Anthony*, 1 *Merivale*, 282.) This rule is subject to some qualifications; but they are not such as affect the present question.

In *Moore* v. *Bennett*, (2 *Chan. Cas.* 246; 1 *Eq. Cas. ab.* 331, *pl.* 7, S. C.; and see 2 *Vern.* 385, *note* 4,) the purchase was made from one who held under a deed containing a power of revocation by will, which power had been executed by devising the property to a third person; and although the purchaser under the deed knew nothing of the will, he was intended to have notice of it as well as the power to revoke. As he knew of the power to revoke, it was his duty to inquire whether it had been executed. And the court laid it down as a principle, that where the purchaser can not make out a title but by a deed, which leads him to another fact, he shall be presumed cognizant of that fact; for it is *crassa neglegentia* that he sought not after it. This doctrine was approved and followed by lord HARDWICKE in *Mertins* v. *Jolliffe*, (*Amb.* 311,) and I am not aware that it has ever been questioned.

In *Ferrars* v. *Cherry*, (2 *Vern.* 383; 1 *Eq. Cas. Ab.* 331, *pl.* 5,) the vendor had previously made a post-nuptial settlement, under which he had only a life estate; his wife had a

Frazer and others *agt.* Western and others.

jointure, and his son the remainder in fee. The settlement was in truth supported by an ante-nuptial agreement; but as that fact was not recited in the deed, and the vendee had no knowledge of it, he acted upon the assumption that the settlement would be void against him as a purchaser, as it would have been without an agreement for the settlement prior to the marriage. But the court held that the vendee had constructive notice that the settlement was supported by ante-nuptial articles; and said, " He ought to have inquired of the wife's relations, who were parties to the deed, whether it was voluntary, or made pursuant to an agreement before marriage." The authority of this case was denied by lord HARDWICKE in *Senhouse* v. *Earle*, (*Amb.* 285, 289,) but that seems not to have been a well considered remark; for the case was afterward cited by the same learned judge, without questioning its authority, in *Mertins* v. *Jolliffe*, (*Amb.* 311, 314,) and has ever since been regarded as good law in England. (*Hiern* v. *Mill*, 13 *Ves.* 121; *Jones* v. *Smith*, 1 *Hare*, 56; 3 *Sugd. Vend.* 211, *ed. of* 1843.)

Let us now apply these principles to the case in hand. The settlement or trust deed under which the defendant, Western, claims title was, as we have already seen, fraudulent and void against the complainants, or one of them, as creditors of Collins, the grantor; and the question is, whether the creditors shall have the property, or whether the defendant shall hold it as a *bona fide* purchaser without any such notice as should have put him upon inquiry. Let us see how much he knew. He not only claims under the trust deed, but he admits in the answer that it was produced to him pending the negotiation for the purchase; and the certificate or conveyance which he took was annexed to the deed. From the deed itself he learned that it was a conveyance in trust, which did not originally vest any legal interest in Mrs. Collins; and he seems to have supposed that she still had nothing more than an equity. This may be inferred from the form of the certificate or conveyance which he took; and from the fact stated in his answer, that for the purpose of perfecting his title, he presented the

certificate to the trustee, and requested him to execute a release in pursuance of the trust created by the deed. He also proved a declaration by Mrs. Collins, that he had " bought the land of her at her repeated request, and when no other person would take the title she could give." Although these facts alone would not deprive him of the character of a *bona fide* purchaser, they prove it strange that he should have concluded the purchase without first seeking the trustee, from whom he might expect to learn more about the matter. But this is not all. He saw that this family settlement did not purport to be made in pursuance of any ante-nuptial agreement, but was a mere voluntary conveyance for the benefit of the grantor and his family. The deed was so contrived, under the law of uses and trusts as it then stood, that the legal estate was put beyond the reach of creditors; and at the same time the rents and profits, or beneficial enjoyment of the land, were secured to the grantor during his life time; and after his decease the property was to go to his wife and her heirs or appointees. No one could read the deed—especially no eminent counsellor at law, like Mr. Western—without having his suspicion aroused that it was a device to defraud the creditors of the grantor. If we follow the authorities on this subject, there was enough to put the defendant upon inquiry in relation to the pecuniary affairs of Collins at the time the settlement was made. He should have gone to the trustee, who was the son of Collins, and to whom he was plainly pointed by the deed; and if he could not obtain the requisite information there, he should have gone to others. I can not doubt that a single half hour's inquiry in the city of New-York would have satisfied him that Collins was insolvent when he made the deed, and was soon afterward dependent on his son for support. In omitting to make the inquiry, I do not suppose that Mr. Western actually intended to do a wrong to creditors; for I take him to be incapable of such an action. But he must have intended to take the hazard, whatever it might be, of purchasing with his eyes shut; and he must abide the consequences. Had it turned out that there were no creditors, or they had not appealed to the laws for the purpose of

Frazer and others *agt.* Western and others.

reaching the property, the defendant would have secured his debt of six hundred dollars against Mrs. Collins, besides getting the land at a moderate price. But in the events which have happened, he has made a bad bargain; for I think the defence can not be supported.

I am of opinion that the decree of the chancellor should be reversed, and that the decree of the assistant vice-chancellor should be affirmed.

☞ RUGGLES and GRAY concurred in this opinion.

The other five judges were in favor of affirming the decree of the chancellor; but were not agreed on the grounds.

There was no written opinion by the five judges.

JONES, WRIGHT and JOHNSON, thought there was not sufficient proof of the insolvency of I. G. Collins at the time he made the trust deed.

JEWETT, GARDINER and JONES, thought that Western was not chargeable with notice of the insolvency of I. G. Collins.

January 14, 1848.  *Decree affirmed.*  Five to three.

And so it seems that the case settles no principle. No five, nor even four, of the judges agreed with the chancellor.

DECISION.—*Decree affirmed. For affirmance :* JEWETT, GARDINER, JONES, JOHNSON and WRIGHT. *For reversal :* BRONSON, RUGGLES and GRAY.

NOTE.—It seems that the law of this case stands as given in the opinion of the chancellor, (1 *Barb, Ch. R.* 235,) a *majority* of the judges of this court not being able to agree upon the ground or grounds of affirmance. (*It may be useful to refer to the law of* CONSTRUCTIVE NOTICE, *as contained in the dissenting opinion of* BRONSON, J.)

The chancellor *held,* that the law sanctions a conveyance founded upon the consideration of blood or marriage merely. The legal presumption therefore is, that such a conveyance is valid, and not a fraud upon the rights of any one. The mere fact that the purchaser from the holder of such a title, has notice that it was not founded upon a pecuniary consideration, is not sufficient to make it his duty, at his peril, to inquire whether the title of the grantor was not fraudulent. On the contrary, he has a right to act upon the legal presumption that such a deed of gift, or voluntary settlement was honestly made, until some other fact is brought to his knowledge to raise a suspicion in his mind that the conveyance was intended to defraud some person.

Also *held,* that although there was some evidence in this case which rendered it probable that I. G. Collins was unable to pay his debts in August, 1828, when

Brady *agt.* McCosker.

the trust deed was executed; yet there was no evidence that Western, who purchased of Mrs. Collins five years afterward, was acquainted with her husband in his life time, or with his circumstances in 1828, so as to make it his duty to inquire as to the intent of the parties to the trust deed, to commit a fraud upon creditors.

*Also held,* that the legal title of the premises in 1828, under the law then in force, was vested in E. K. Collins, the trustee; and the *cestui que trust,* or her grantee, previous to 1830, had only an *equitable* interest in the property. But under the provisions of the revised statutes, (1 *R. S.* 727, § 47,) this equitable interest was turned into a legal estate in the premises in fee, especially after the death of her husband, and Western acquired the *legal title* to the premises, under the conveyance from Mrs. Collins in May, 1833.

And that since the reversal of Chancellor KENT's decision in the case of Roberts v. Anderson, by the court of dernier resort, (3 *John. Ch. R.* 372; 18 *John. Rep.* 515, *S. C.,*) it is no longer an open question in this state, that a *bona fide* purchaser of property from a previous grantee, to whom it had been conveyed for the purpose of defrauding creditors, is entitled to protection against the claims of the creditors, who were intended to be defrauded by the first conveyance.